UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____
|
MICHIGAN CHAMBER OF COMMERCE,          |      Case No. 1:10-cv-664
MICHIGAN CHAMBER                       |
POLITICAL ACTION COMMITTEE III, and    |
STERLING CONSULTING CORPORATION,       |      HONORABLE PAUL L. MALONEY
                                       |      Chief United States District Judge
        Plaintiffs,                    |
                                       |
            v.                         |
                                       |
TERRI LYNN LAND, in her official capacity |
as Michigan Secretary of State,        |
                                       |
        Defendant.                     |
                                       |
_____|

## OPINION and ORDER
### *" Michigan Chamber 2 "*

**Rejecting Defendant's Ripeness, Administrative Exhaustion, Abstention, and Laches Arguments;
Granting in Part and Denying in Part the Application for Preliminary Injunctive Relief:**

Preliminarily Enjoining the Defendant from Enforcing MICH. COMP. LAWS § 169.254 against
Corporations/Unions' Paying Money to a PAC or Other Conduit for the Purpose of the PAC Making
Expenditures Which Are Not in Any Degree Coordinated with a Candidate or Candidate-Related Entity
and against the PAC's Solicitation, Receipt and Expenditure of Such Monies

Permitting the Defendant to Enforce MICH. COMP. LAWS § 169.254 against The Plaintiff Corporations
Paying Money to a PAC or other Conduit for the Purpose of the PAC Making Expenditures Which Are in
Any Degree Coordinated with a Candidate or Candidate-Related Entity, and against the PAC's
Solicitation, Receipt and Expenditure of Such Monies

**Declining to Stay the Preliminary Injunction Pending Appeal**

This is a civil-rights action under 42 U.S.C. § 1983[1] to enjoin the Michigan Secretary of State

_____
[1]

Section 1983 provides, in pertinent part,

("Secretary")'s alleged ongoing violation of the plaintiffs' First Amendment rights to freedom of political speech and association.[2]  Specifically, the plaintiffs lodge an as-applied challenge to the Secretary's interpretation and application of a provision of the Michigan Campaign Finance Act ("MCFA"), MICH. COMP. LAWS § 169.254(1).  *See generally New Mexico Youth Organized v. Herrera*, No. 09-2212, – F.3d –, 2010 WL 2598314, *9 n.5 (10th Cir. June 30, 2010) ("The 'as-applied' challenge acknowledges may have some potentially constitutionally permissible applications, but argues that the law is not constitutional as applied to these organizations."); *US v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010) (the distinction between facial challenge and as-applied challenge is "'both instructive and necessary' insofar as it 'goes to the breadth of the remedy employed by the Court'") (quoting *Citizens United v. FEC*, 558 U.S. at –, 130 S.Ct. 876, 893 (2010)).  The court has uncontested federal-question jurisdiction pursuant to 28 U.S.C. § 1343(a)(3), which confers original jurisdiction on the federal district courts over § 1983 actions.

The Secretary contends that the court should deny preliminary injunctive relief and dismiss the complaint on four independent grounds:  ripeness, laches, failure to exhaust state

---

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District or Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suite in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

[2]

"Although the language of the First Amendment is a limitation upon the power of Congress, the principle is now firmly established that the concept of due process as contained in the Fourteenth Amendment incorporates all of the fundamental rights contained within the First Amendment, including freedom of speech, and accordingly forbids any state abridgement thereof."  *Melton v. Young*, 328 F. Supp. 88, 95-96 (E.D. Tenn. 1971) (Frank W. Wilson, C.J.) (citing *Tinker v. Des Moines*, 393 U.S. 503 (1969) and *Talley v. Calif.*, 362 U.S. 60 (1960)).

2

administrative/judicial remedies, and abstention.  In the alternative, the Secretary urges the court to deny preliminary injunctive relief by rejecting plaintiffs' claims under a standard less demanding than strict scrutiny.  For the reasons that follow, the court will reject these arguments, consider the merits of the complaint under the strict-scrutiny standard, and issue preliminary injunctive relief (though not of the scope requested by the plaintiffs).  The court will also decline to stay the injunction pending appeal.

The plaintiffs are the Michigan Chamber of Commerce ("the Chamber"), Chamber member Sterling Consulting Corporation ("Sterling"), and the Michigan Chamber Political Action Committee ("PAC").  The Chamber is a non-profit organization, organized under Internal Revenue Code § 501(c)(6), whose membership is open to persons, corporations or other entities who subscribe to its mission statement, pay dues, and are accepted for membership,  Complaint filed July 12, 2010 ("Comp") ¶ 21 and Ex D - Affidavit of Michigan Chamber of Commerce CEO and President Richard Studley executed July 12, 2010 ("Studley Aff") ¶¶ 1 and 3.  Sterling is a for-profit corporation and Chamber member which "lacks the resources to finance a meaningful amount of independent expenditures on its own behalf" and thus "intends to associate with other similarly situated corporations . . . to pool resources" with other corporations "in order to amplify their own voices with respect to independent expenditures on behalf of or in opposition to candidates for political office."  Comp ¶ 23 and Ex F - Affidavit of Sterling Consulting Corporation President Stephen Linder executed July 9, 2010 ("Linder Aff").  Critical to the resolution of the instant case, the PAC's <u>sole</u> purpose is to make independent expenditures under MCFA, and it would receive contributions for this purpose from corporations and other entities, including the Chamber and Sterling.  *See* Comp ¶ 22 & Ex E - Affidavit of Michigan Chamber PAC III Treasurer Robert

LaBrant executed July 12, 2010 ("Labrant Aff").

The Chamber, the PAC, and Sterling intend to engage in corporate independent expenditures supporting and opposing candidates for political office, including advertisements in newspapers and on billboards, television, radio and the Internet; endorsing candidates and informing businesses of those endorsements; placing endorsements on websites; using blogs to post messages of support or endorsement; encouraging Chamber members to endorse or support certain candidates; coordinating rallies; and organizing and staffing telephone banks, *see* Comp ¶ 24.  The three plaintiffs have refrained from engaging in these independent corporate expenditures when they would seem to be prohibited by the defendant Michigan Secretary of State Terri Lynn Land ("Secretary")'s interpretation of the MCFA, *see* Comp ¶ 29.[3]

Plaintiffs instituted this action on July 12, 2010 by filing a complaint and *ex parte* applications for temporary restraining order, preliminary and permanent injunctive relief, and declaratory relief.  Defendant Land is named only in her official capacity as Secretary of State and therefore chief elections officer for the State of Michigan.  *See* Comp ¶¶ 9-12.  The Chamber complains that Secretary Land's interpretation of the Michigan Campaign Finance Act, MICH.

---

[3]

In Michigan the position of Secretary of State is an elective office, *see* MICHIGAN CONST. 1963, Art. 5 § 21, and the Secretary is the single executive heading the Department of State, *see* MICHIGAN CONST. 1963, Art. 5 § 3, which is one of the principal departments in the Executive Branch of state government, *see* MICH. COMP. LAWS § 16.104(1).  Under the MCFA and the Administrative Procedures Act, the Secretary has the authority to issue "a declaratory ruling as to the applicability to an actual state of facts of the statute", *Michigan Education Ass'n v. Michigan Sec'y of State*, 280 Mich. App. 477, 479, 761 N.W.2d 234, 235 (W.D. Mich. Aug. 28, 2008) (citing MICH. COMP. LAWS § 169.215(1)(e)) and § 24.264), *app. granted on other grounds*, 486 Mich. 952, 782 N.W.2d 507 (Mich. 2010).

COMP. LAWS § 169.201 *et seq.*,[4] violates their First Amendment rights to freedom of speech and freedom of association by restricting their right to make certain "independent" political expenditures during and in connection with campaigns for state elective office.  The Chamber persuasively contends that the need to remove the putatively unconstitutional restrictions is urgent given the approach of Michigan's upcoming party primary elections on August 3, 2010 and the general election on November 2, 2010.  Specifically, the Chamber attacks the Secretary's interpretation and application of section 54, subsection 1 of the MCFA, which provides as follows:

> Except with respect to the exceptions and conditions in subsections (2) and (3) and section 55 [MICH. COMP. LAWS § 169.255], and to loans made in the ordinary course of business, *a corporation*, joint stock company, domestic dependent sovereign, *or labor organization shall not make a contribution or expenditure* or provide volunteer personal services that are excluded from the definition of a contribution by section 4(3)(a) [MICH. COMP. LAWS § 169.204(3)(a), i.e., certain volunteer services or travel cost reimbursement less than $500 in a calendar year].

MICH. COMP. LAWS § 169.254(1) (emphasis added).[5]  In turn, MCFA section 4(1) defines a contribution to mean

> a payment, gift, subscription, assessment, expenditure, contract, payment for services, dues, advance, forbearance, loan, or donation of money or anything of ascertainable monetary value, or a transfer of anything of ascertainable monetary value to a person, made *for the purpose of influencing the nomination or election of a candidate, or for the qualification, passage or defeat of a ballot question*.

---

[4]

The Michigan Legislature enacted the MCFA by passing P.A. 1976, No. 388, eff. Dec. 30, 1976, and the Act was amended by P.A. 1994, No. 117 § 1 (eff. Apr. 1, 1995) and P.A. 1994, No. 385 § 1 (eff. Jan. 1, 1995).

[5]

The plaintiffs do not challenge the interpretation or application of the other two provisions of this section of the MCFA.  Section 54(2) imposes the same contribution/expenditure/volunteer work restriction on any officer, director, stockholder, attorney, agent, or any other person acting on behalf of a corporation or labor union, *see* MICH. COMP. LAWS § 169.254(2).  Section 54(3) allows corporations and labor unions to contribute to a ballot question committee, and to make independent expenditures to pass, defeat, or qualify a ballot question, *see* MICH. COMP. LAWS § 169.254(3).

5

MICH. COMP. LAWS § 169.204(1) (emphasis added).[6]  "[W]hen a statute specifically defines a given term, that definition alone controls."  *Tryc v. Michigan Veterans Facility*, 451 Mich. 129, 136, 545 N.W.2d 642 (Mich. 1996) ("Applying these principles, the definition of 'hospital' supplied in the statute, being clear and unambiguous, controls.  Judicial construction is not permitted.") (citing, *inter alia*, *Butterfield Theatres, Inc. v. Revenue Dep't*, 353 Mich. 345, 91 N.W.2d 269 (Mich. 1958)) (footnote omitted).

An individual who knowingly violates MCFA section 54(1) by making such a contribution is guilty of a felony punishable by a fine up to $5,000 and/or a prison sentence up to three years; a corporation or labor union which knowingly does so is guilty of a felony punishable by a fine up to $10,000.  *See* MICH. COMP. LAWS § 169.254(4).  The Chamber, the PAC, and Sterling Consulting all propose and intend to engage in campaign activities and expenditures which are prohibited by MICH. COMP. LAWS § 169.254 as interpreted by the Secretary, and they fear that the Secretary will initiate criminal prosecution against them and their officers, employees and agents if they do so.  *See* Comp ¶ 16.

After the United States Supreme Court issued its opinion in *Citizens United v. Federal Election Commission*, ___ U.S. ___, 130 S.Ct. 876 (2010), the Chamber on February 19, 2010 wrote a letter to Secretary Land requesting a declaratory ruling or interpretive statement of portions of the

---

[6]

Subsection two clarifies that an MCFA "contribution" includes the full price of tickets to a fund-raising event, the granting of discounts or rebates not available to the general public, the endorsing or guaranteeing of a loan, etc.  *See* MICH. COMP. LAWS § 169.204(2).

Subsection three provides that an MCFA "contribution" does *not* include volunteer personal services or travel cost reimbursement less than $500 or food or beverages worth less than $100 in a calendar year, and any offer or tender which is unconditionally and expressly rejected and returned within thirty business days after receipt.  *See* MICH. COMP. LAWS § 169.204(3).

MCFA. The Chamber's request stated the following facts:

1.     The Chamber is a Michigan nonprofit corporation and a trade association, and is an interested person whose course of action would be affected by a declaratory ruling.

2.     The Chamber's members consist of more than 7,000 entities, many of them corporations.

3.     MCPAC III will not be a separate segregated fund of the Chamber under section 55 of the MCFA (MCL 169.255).

4.     MCPAC III will be a distinct and separate entity. Its funds and assets will not be commingled with those of the Chamber, the Michigan Chamber PAC, the Michigan Chamber PAC II, or any other entity.

5.     Contributions to MCPAC III would come from the following sources:

    a.     Contributions from persons that [sic] were specifically solicited or received for the express purpose of making a contribution to MCPAC III.

    b.     Chamber treasury funds.

6.     MCPAC III would report contributions from the Chamber treasury as being from the Chamber. MCPAC III would report contributions from another person's treasury funds as being made from that person.

7.     The Chamber intends to make in-kind contributions to MCPAC III, "including, but not limited to, in-kind contributions with respect to the administration and solicitation of contributions to MCPAC III.

Complaint filed July 12, 2010 ("Comp"), Exhibit ("Ex") A (May 21, 2010 Declaratory Ruling and Interpretive Statement of Michigan Secretary of State Terri Lynn Land) at 1-2.

Secretary Land issued her declaratory ruling on May 21, 2010, construing the Chamber's request as "focus[ing] on the applicability of the Act's registration and reporting requirements to corporate independent expenditures." Comp Ex A at 2. **In pertinent part, the Secretary's ruling answered the Chamber's questions as follows:**

In *Citizens United*, the United States Supreme Court overruled its decision in *Austin v Michigan Chamber of Commerce*, 494 US 652 . . . (1990). By overruling *Austin*, the Supreme Court declared that section 54 of the MCFA (MCL 169.254) is unconstitutional to the extent that it prohibits independent expenditures by corporations, labor organizations or domestic dependent sovereigns (collectively referred to as "corporations" for purposes of this response).

However, as pointed out in your request, *Citizens United* left in effect the prohibition against "contributions" as defined in section 4 of the Act [Mich. Comp. Laws § 169.204(3)(a)] from those organizations.

* * *

2.      "Whether Michigan Chamber PAC III may make 'independent expenditures' on behalf of candidates (as defined in the Act) pursuant to the Act?"

Yes. It is clear that the MCFA cannot constitutionally prohibit a corporation from making independent expenditures to express its own views in support of or opposition to candidates in Michigan elections.

3.      "Whether Michigan Chamber PAC III may only engage in express advocacy activities for candidates by making independent expenditures pursuant to the Act?"

The limited impact of *Citizens United* under the MCFA is that it allows a corporation to make and report independent expenditures by engaging in political speech that expressly advocates the nomination or election of state and local candidates. The express advocacy must consist of the corporation's own political speech and be funded exclusively by that corporation.

4.      "Whether Michigan Chamber PAC III may make contributions to another political committee which contains funds derived from Section 54 entities?"

No. *Citizens United* only lifted the section 54 ban on independent expenditures. The ban on contributions remains intact and cannot be avoided by transferring corporate funds to MCPAC III and then contributing those funds to another committee.

Moreover, an MCPAC III contribution to another political committee would not be an "independent expenditure" permitted under *Citizens United*. Pursuant to section 9(2) of the MCFA (MCL 169.209), an "independent expenditure" is an "expenditure by a person if the expenditure is not made at the direction of, or under the control of, another person and <u>if the expenditure is not a contribution to a committee</u>." (Emphasis added.)

Comp Ex A at 1 (First ¶ break added) and 4. A June 20, 2010 newspaper editorial by Secretary

Land further illustrates her interpretation of *Citizens United*:

> [T]he Court held it is unconstitutional to bar corporations, labor organizations and domestic dependent sovereign nations (Indian tribes) from using their general treasury funds to make independent expenditures on behalf of federal, state or local candidates. In essence, the Court ruled that these entities can voice their direct support [of] or opposition to candidates.

> This decision, *Citizens United v. Federal Election Commission*, overruled the Court's 1990 ruling in *Austin v. Michigan Chamber of Commerce* . . . .

> In response, the Department of State issued guidance on how corporations, unions and tribes wishing to make independent expenditures should disclose this information in accordance with the Michigan Campaign Finance Act. * * *

> First, please note that the Supreme Court did not lift its existing ban on direct contributions. Corporations (and other entities) still cannot make contributions to candidates themselves or their [the candidates'] political committees.[7]

> However, corporations may now make independent expenditures by engaging in political speech that expressly advocates the nomination or election of state and local candidates. Each corporation must exclusively use its own general treasury funds to express its political views.

> A corporation may not solicit contributions from other sources[,] and treasury funds from other corporations cannot be contributed for the purpose of funding these independent expenditures. Any corporation that does so would violate the MCFA and be subject to criminal penalties.

Comp Ex B (Lansing State Journal of June 20, 2010 at 11A, unnumbered ¶¶ 2-7).

**In other words, Secretary Land interprets MICH. COMP. LAWS § 169.254 (1)** to prohibit

the Chamber, Sterling or any other corporation from making a monetary payment to the PAC for the

---

[7]

Secretary Land is correct on this score. *See Green Party of Connecticut v. Garfield*, – F.3d –, –, 2010 WL 2737134, *6 (2d Cir. July 13, 2010) ("[I]n the recent *Citizens United* case, the Court overruled two of its precedents and struck down a federal law banning independent campaign *expenditures* by corporations, but it explicitly declined to reconsider its precedents involving campaign *contributions* by corporations to candidates for elected office.") (citing *Citizens United*, – U.S. at –, 130 S.Ct. at 909 ("Citizens United has not made direct contributions to candidates, and it has not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny.")).

9

purpose of the PAC making independent expenditures, **(2)** prohibit the Chamber from *soliciting* anyone to contribute to the PAC for that purpose, and **(3)** thereby prevent the PAC from making independent expenditures, because it could not receive "contributions" from the Chamber, Sterling Consulting, a Chamber member, or any other corporation. *See* Comp at 1-2. The plaintiffs maintain that such payments by itself or its corporate members do not constitute "contributions" (through the PAC) to the candidate benefitted by the independent expenditures. This is a significant, potentially dispositive disagreement, because Supreme Court case law permits a State to prohibit corporations and labor unions from making "contributions" to candidates. Conversely, that same case law does not permit a State to abridge a corporation or labor union's right to make "independent expenditures", which are intended to benefit and presumably do benefit particular candidates but are not given directly to the candidate or his candidate or party committee (nor coordinated with or controlled by the candidate).

### This Controversy is Ripe for Adjudication.

The Secretary contends that this as-applied challenge to MICH. COMP. LAWS § 169.254(1) is not ripe for adjudication for the following reasons:

> [O]ther than stating that Plaintiffs would like to engage in the activities described in ¶ 24 of their complaint, Plaintiffs do not demonstrate that they have made any significant preparations for engaging in such activity, or that they are immediately prepared to begin such activities. Thus, it is not clear that the harm Plaintiffs allege – enforcement of the MCFA by the Secretary – will come to pass any time soon. Second, no factual record has been developed that will produce a fair adjudication on the merits of Plaintiffs' as-applied First Amendment claim. Without engaging in any activities or making any contributions or expenditures against which to assess the law, Plaintiffs' claims cannot be fairly decided. This case does not present solely a question of law. Finally, it is not clear what hardship Plaintiffs will suffer if the Court denies relief at this stage. * * *

> Moreover . . . Plaintiff corporations are free to engage in all of the described activities on their own or jointly [with other corporations, but not, according to the Secretary, by banding together with other corporations to pay money to the PAC for the PAC to make independent expenditures benefitting a candidate].

Secretary's Opp (Doc 11) at 20 (paragraph break added).  The court disagrees.

Designed to ensure that the federal courts resolve "existing, substantial controversies," *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002), not disputes "anchored in future events that may not occur as anticipated" or may not occur at all, *Nat'l Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997), the ripeness doctrine ensures that a dispute is concrete and real before the judicial branch resolves it.  *See Carey v. Wolnitzek*, Nos. 08-6468 and 08-6538, – F.3d –, –, 2010 WL 2771866, *4 (6th Cir. July 13, 2010) (J. Sutton, joined by J. Batchelder, with D.J. Wiseman concurring in pertinent part).  The doctrine, "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction," the ripeness doctrine seeks to avoid premature adjudication of legal questions, thus preventing courts from "entangling themselves in abstract debates that may turn out differently in different settings."  *Warshak*, 532 F.3d at 525.  It is the plaintiffs' burden to show that their as-applied challenge is ripe for review.  *See Connecticut Dist'g Co. v. Holder*, 557 F.3d 321, 342 (6th Cir.) (J. Sutton for the Court, joined by J. Griffin and nine others) (*en banc*), *cert. denied*, – U.S. –, 130 S.Ct. 362 (2009).

As the Secretary notes, Opp at 20, three considerations inform the doctrine:  Is the alleged injury likely to occur?  Is the factual record sufficiently developed to resolve the question?  And what kinds of hardships, if any, will the parties if the court delays resolution of the question? *Carey*, – F.3d at –, 2010 WL 2771866 at *4 (citing *Warshak v. US*, 532 F.3d 521, 525 (6th Cir. 2008) (*en banc*)).  The Secretary neglects to mention, however, that "[i]n the context of a free-speech . . . challenge like this one, a relaxed ripeness applies to steer clear of the risk that the law 'may cause

others not before the court to refrain from constitutionally protected speech or expression.'" *Carey*, – F.3d at –, 2010 WL 2771866 at *4 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). The court intimates no opinion as to whether this complaint could meet the customary ripeness standard, finding only that it satisfies the relaxed ripeness standard governing free-speech cases.

Essentially, the Secretary would have the plaintiffs either not exercise what they colorably believe to be their First Amendment rights, or exercise those rights and take their chance on being prosecuted for a felony offense under Michigan law, *see* MICH. COMP. LAWS § 169.254(4). In a very similar Free Speech context, Justice Scalia respond to the FEC's assurance that enforcement of a statute was an uncertain prospect:

> So you're – you are a lawyer advising somebody who is about to come out with a book and you say don't worry, the FEC has never tried to send someone to prison for this. This statute covers it, but don't worry, the FEC has never done it. Is that going to comfort your client. I don't think so.

Transcript of Oral Argument in *Citizens United v. FEC*, No. 08-205, 558 U.S. –, 130 S.Ct. 876 (2010), attached as P's Reply Ex N.

It is undisputed that all three plaintiffs are ready to engage in activities which are arguably protected by the First Amendment, *see* Comp ¶¶ 16-31; Comp Ex D (Studley Aff) ¶¶ 5-6 and 8; Comp Ex E (LaBrant Aff) ¶¶ 5-6 and 10; Comp Ex F (Linder Aff) ¶¶ 2-3 and 6, but are not doing so due to their fear of prosecution under the Secretary's interpretation of MICH. COMP. LAWS § 169.254(1), *see* Comp Ex D ¶¶ 9 & 11, Comp Ex E ¶¶ 7 & 9, and Comp Ex F ¶¶ 5 & 7. Thus this matter is ripe for decision. *See Carey*, – F.3d at –, 2010 WL 2771866 at *4 ("In future judicial elections, as in prior ones, he claims an interest in engaging in protected speech that implicates, if not violates, each clause. He wants to let voters know his party affiliation. He wants to solicit campaign funds directly, as opposed to indirectly via an election committee. And he wants to

12

answer judicial questionnaires propounded by a local right-to-life organization.  These aspects of

the canon  at least chill, and in some instances prohibit, these forms of communication, and in the

course of the November 2006 election, at least until the entry of the October 2006 injunction, Carey

censored himself on each topic.  All of this establishes a 'credible fear of enforcement,' *Norton*, 298

F.3d at 554, sufficient to overcome any ripeness concerns.").

> **Plaintiff Chamber's Failure to Exhaust Its State Administrative Remedies Does Not Require or Counsel this Court to Decline Jurisdiction over this Section 1983 Action.**

Under state law, "[a] declaratory ruling is subject to judicial review in the same manner as

an agency final decision or order in a contested case."  MICH. COMP. LAWS § 24.263.  Namely, the

plaintiffs had sixty calendar days to notice an appeal from the Secretary's interpretive ruling, first

to the circuit court and then, if necessary, to the Michigan Court of Appeals and Michigan Supreme

Court.  *See* MICH. COMP. LAWS §§24.263 and 24.301 and 24.304(1).  Parties dissatisfied with the

Secretary's interpretation of the MCFA have availed themselves of this route before.  *See, e.g., MEA

v. Michigan SOS*, 280 Mich. App. 477, 483, 761 N.W.2d 234, 237 (Mich. App. 2008) (P.J. Wilder,

<u>O'Connell</u>, Whitbeck) ("Respondent Secretary of State appeals by leave granted the trial court order

setting aside as arbitrary and capricious respondent's declaratory ruling interpreting § 57 of the

Michigan Campaign Finance Act."), *app. granted on other grounds*, 486 Mich. 952, 782 N.W.2d

507 (Mich. 2010).  It is undisputed that the plaintiffs have not pursued such an appeal.  The

Secretary contends that

> [b]ecause Plaintiff invoked the administrative process, which entitled it to direct
> review in the state courts, Plaintiff Chamber should be required to exhaust that
> process before seeking relief in this Court.  There is no reason to believe that
> appealing to the circuit court would have been futile, and any concern over
> timeliness could have been resolved by seeking an injunction and expedited relief
> from the court.

State's Opp at 19-20.

Under Michigan law, the presence of constitutional issues does not necessarily relieve a party aggrieved by an SOS declaratory ruling of its duty to appeal through the state courts as specified by Michigan statute. As the Michigan Court of Appeals stated in a recent published decision,

> Plaintiff associations were required to exhaust their administrative remedies because they sought review of defendant's interpretation of the MCFA and because the remedies afforded by the act "are the *exclusive* means by which this act may be enforced."' M.C.L. § 169.215(16) (emphasis added). With respect to Count III, which raised constitutional challenges, the mere framing of an issue as constitutional does not excuse plaintiff associations "from pursuing statutorily imposed administrative remedies when other issues are in controversy."

*Huron Valley Schs. v. Michigan Sec'y of State*, 266 Mich. App. 638, 653, 702 N.W.2d 862, 870 (Mich. App. 2005) (quoting *WA Foote Mem. Hosp. v. Dep't of Pub. Health*, 210 Mich. App. 516, 524, 534 N.W.2d 206 (Mich. App. 1995)), *app. den.*, 474 Mich. 1085, 711 N.W.2d 336 (Mich. 2006).

The Michigan courts do hold that "[e]xhaustion of administrative remedies is not an inflexible condition precedent to judicial consideration . . . and will not be required if review of the agency's final decision would not provide an adequate remedy . . . ." *Citizens for Common Sense in Gov't v. Michigan Atty. Gen.*, 243 Mich. App. 43, 53, 620 N.W.2d 546, 552 (Mich. App. 2000) (quoting *IBM Corp. v. Dep't of Treasury*, 75 Mich. App. 604, 610, 255 N.W.2d 702, 709 (Mich. App. 1977) (P.J. Bashara, Cavanagh, Riley) (citing MICH. COMP. LAWS § 24.301[8] and M.S.A. §

---

[8] This statutory section provides as follows:

When a person has exhausted all administrative remedies available within an agency, and is aggrieved by a final decision or order in a contested case, whether such decision or order is affirmative or negative in form, the decision or order is subject to direct review by the courts as provided by law.

3.560(201))).  In this vein, the complaint asserts that "Plaintiffs are seeking relief that could not be granted by the Defendant in a declaratory ruling, and therefore, could not be granted by a State Court in an appeal of a declaratory ruling."  Comp ¶ 19.

To the extent that plaintiffs rest on the notion that the Secretary of State – or state courts reviewing the Secretary's ruling – cannot address constitutional claims, the court must reject that notion.  Michigan's state courts are perfectly well qualified to consider and rule intelligently on federal constitutional claims.  *See Nevers v. Killinger*, 169 F.3d 352, 371 (6th Cir. 1999) ("'State courts are fully qualified to identify constitutional error . . . .'") (C.J. Rehnquist for the majority) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 636 (1993)), *abrogated o.g. by Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000); *Morris v. Bell*, No. 96-5510, 124 F.3d 198, 1997 WL 560055, *2 (6th Cir. Sept. 5, 1997) (Batchelder, Moore, Cole) ("The Supreme Court has consistently recognized that the state courts are fully empowered to adjudicate federal rights adequately, and federal courts may not assume that the state courts will fail to carry out that responsibility.") (citing *Ex Parte Royall*, 117 U.S. 241, 251 (1886) (stating that, under our federal system, the federal and state courts are "equally bound to guard and protect rights secured by the Constitution)).

Experience shows that in appropriate cases, the Michigan courts can consider such federal constitutional issues on appeal from an SOS ruling.  For example, in *Swinehart v. Michigan Sec'y*

---

Exhaustion of administrative remedies does not require the filing of a motion or application for rehearing or reconsideration unless the agency rules require the filing before judicial review is sought.

A procedural, preliminary, or intermediate agency action or ruling is not immediately reviewable, except that the court may grant leave for review of such action if review of the agency's final decision or order would not provide an adequate remedy.

MICH. COMP. LAWS § 24.301 (paragraph breaks added).

15

*of State*, 27 Mich. App. 318, 183 N.W.2d 397 (Mich. App. 1970) (P.J. Quinn, Brennan, Cir. J. Ziem), Swinehart appealed from the Secretary of State's determination that the procedure for challenging non-renewal of driver's license did not violate his constitutional rights. The Michigan Court of Appeals would have entertained the appeal if not for the fact that the Secretary had issued Swinehart a license and the situation was unlikely to recur, rendering the appeal moot. *Swinehart*, 27 Mich. App. at 320-21, 183 N.W.2d at 398-99.

Nonetheless, as a matter of *federal* law, exhaustion of administrative remedies is simply not required in non-prisoner actions under 42 U.S.C. § 1983. In other words, the exhaustion of administrative remedies is not a jurisdictional prerequisite for non-prisoner section 1983 actions as it is with some other types of federal-court actions. The Secretary cites *Patsy v. Board of Regents of State of Florida*, 457 U.S. 496, 516 (1982) for the proposition that "[w]hile the exhaustion of state administrative remedies is generally not required as a prerequisite to bringing an action pursuant to 42 U.S.C. § 1983, this Court has discretion to require exhaustion." State's Opp at 17-18 with n.48. *Patsy* stands for no such proposition. Rather, *Patsy* merely recognized that Congress has "created a specific, limited exhaustion requirement for adult prisoners bringing actions pursuant to § 1983." *Patsy*, 457 U.S. at 508 (discussing The Civil Rights of Institutionalized Persons Act, particularly 42 U.S.C. § 1997e). Far from recognizing or intimating a district court's discretion to require other section 1983 plaintiffs to exhaust state administrative remedies, *Patsy* declared that

> Section 1997e and its legislative history demonstrate that Congress understood that exhaustion is not generally required in section 1983 actions, and that it decided to carve out only a narrow exception to this rule. A judicially imposed exhaustion requirement would be inconsistent with Congress' decision to adopt § 1997e and would usurp policy judgments that Congress has reserved for itself.

*Patsy*, 457 U.S. at 508; *see, e.g., Cramer v. Vitale*, 359 F. Supp.2d 621, 628 (E.D. Mich. 2005) (John

16

Corbett O'Meara, J.) (in First Amendment free-speech action, court stated, "To require plaintiff to exhaust state judicial remedies before proceeding on a 1983 claim is contrary to the Supreme Court's holding in both *Patsy* and *Williamson* [*Cty. Reg. Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985)].").  Thus, the Secretary has presented no authority, binding or persuasive, in support of her assertion that this court has discretion to decline jurisdiction solely due to the plaintiffs' failure or refusal to seek review of the Secretary's decision in the Michigan state courts.  The court finds no such authority[9], but need not decide this issue today in any event.

---

[9]

If there were a pending "coercive" action in the state administrative apparatus initiated by the State, rather than merely a "remedial" action triggered by the request of the plaintiffs, *Younger* abstention might be permissible.  As Judge Quist has explained,

> Another relevant consideration in determining whether *Younger* abstention is applicable to the circumstances of the particular case is whether the proceedings in the underlying state case are coercive as opposed to remedial.  The coercive/remedial distinction was first drawn by the Supreme Court in *Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619 . . . (1986), where it distinguished its prior decision in *Patsy* [where it held that a plaintiff is not required to exhaust state administrative remedies before bringing a § 1983 action in federal court.  * * * In *Dayton Christian Schools*, the Ohio Civil Rights Commission initiated administrative proceedings against Dayton Christian Schools in response to a complaint of discrimination by an employee . . . .  While the administrative proceedings were pending, Dayton Christian Schools filed a § 1983 action in federal court.  The Supreme Court held that in light of the pending administrative proceeding, the district court should have abstained under *Younger*.  With regard to its ruling in *Patsy*, the Court observed:
>
>> * * * Unlike *Patsy*, the administrative proceedings here are coercive rather than remedial, began before any substantial involvement in the federal action took place, and involve an important state interest.
>
> *Dayton Christian Schs.*, 477 U.S. at 627 n.2 . . . .  Thus, in remedial state proceedings, the plaintiff is attempting in both state and federal courts to vindicate a wrong inflicted by the state; in coercive state proceedings, the federal plaintiff is the state court defendant, and the state proceedings were initiated to enforce a state law."

17

To the extent that this court might have discretion to decline jurisdiction due to lack of exhaustion, whether under *Younger*, under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) as urged by the Secretary (Gov's Opp at 20-21), or under *Colorado River* the court chooses to exercise jurisdiction and reach the merits of this important controversy, which clearly favor the plaintiffs. *See generally Wright v. Morris*, 111 F.3d 414, 421 (6th Cir. 1997) ("Sending these plaintiffs back to exhaust their administrative remedies would, of course, lighten this court's docket, at least temporarily. However, 'policy considerations alone cannot justify judicially imposed exhaustion unless exhaustion is consistent with congressional intent.'") (quoting *Patsy*, 457 U.S. at 513).

As a final note on the exercise of jurisdiction, the Secretary contends that plaintiffs' federal section 1983 cause of action is defeated as a matter of law by the MCFA, which provides as follows:

> There is no private right of action, either in law or in equity, under this act. The remedies provided in this act are the exclusive means by which this act may be enforced and by which any harm resulting from a violation of this act may be redressed.

MICH. COMP. LAWS § 169.215. The Secretary also relies on decisions holding that "'[a] declaratory judgment action cannot be maintained to resolve disputes which are within the exclusive jurisdiction of an administrative agency.'" State's Opp at 18 (quoting *Huron Valley Schs. v. Michigan SOS*, 266 Mich. App. 638, 646 (Mich. App. 2006) (quoting *St. Paul Fire & Marine Ins. Co. v. Littky*, 60 Mich. App. 375, 378, 230 N.W.2d 440 (Mich. Ap. 1975))) and citing *Citizens for Common Sense in Gov't v. Atty. Gen.*, 243 Mich. App. 43, 50, 620 N.W.2d 546 (Mich. App. 2000) ("if the Legislature has expressed an intent to make an administrative tribunal's jurisdiction exclusive, then the circuit court

---

*Executive Art Studio, Inc. v. City of Grand Rapids*, 179 F. Supp.2d 755, 761 (W.D. Mich. 2001). Here, the record does not disclose any pending action by the Secretary to enforce the MCFA against these plaintiffs. Accordingly, their instant section 1983 action arises out of a "remedial" state agency action or proceeding, as in *Patsy*, not "coercive" as in *Dayton Christian Schools*.

cannot exercise jurisdiction over those same areas.").

The Secretary's argument on this score lacks merit for at least two reasons.  First, it is not at all clear that the Michigan Legislature intended to commit *federal constitutional claims* to the exclusive jurisdiction of the Secretary.  Indeed, that would be an odd and counterintuitive move, as there is no reason to believe that the Secretary has any particular expertise, compared to the federal and state courts, in interpreting the U.S. Constitution.  Second, even if the Michigan Legislature through the aforementioned provisions intended to commit federal constitutional issues to the exclusive jurisdiction of the Secretary (with an appeal to the state courts), the Legislature lacked authority to do so.  Although the Tenth Amendment's text and the very structure and history of the Constitution reserve substantial powers to the States rather than the federal government, there is *no* precedent suggesting that a State may presume to effectively block federal courts from entertaining federal constitutional challenges to state regulatory action and interpretation.  The federal courts and the state courts of Michigan generally have concurrent jurisdiction to adjudicate federal constitutional claims, and the Secretary proffers no authority that this situation presents an exception.

**Having decided to exercise jurisdiction, the court must address one more issue before turning to the merits:  the Secretary's laches defense.**  The Secretary contends that the plaintiffs

> delayed inexcusably in bringing this action, and then demanding relief before the August 3, 2010 primary.  The Secretary issued her declaratory ruling on May 21, 2010.  Had Plaintiff Chamber of Commerce appealed to the [state] circuit court shortly thereafter, the issues presented here could have been decided by the state courts in a more timely and sensible manner before the primary.  [T]here seems to be no reason why the instant lawsuit was not filed shortly after the declaratory ruling.  Instead, Plaintiffs waited 59 days from the ruling to file their lawsuit, leaving only 23 days within which to address matters before the August 3 primary.  Plaintiffs should not be rewarded for delaying filing, thereby creating their own "emergency" need for relief.

19

Gov's Opp at 21-22.  The court disagrees with the Secretary and will not dismiss the complaint on the basis of laches.  The Secretary shows that the first element of laches is satisfied (lack of reasonable diligence by the plaintiffs), but she fails to satisfy the second element (material prejudice to the Secretary and/or the State of Michigan or its voters).

Preliminarily, "[a] constitutional claim can become time-barred just as any other claim can", *US v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9 (2008) (Roberts, C.J., for a unanimous Court) (citation omitted), and the determination of whether laches applies is a question for the court, not a jury, see *Bonner Farms v. Fritz*, 355 F. App'x 10, 18 (6thCir. 2009) (citing, *inter alia, Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 487 (6th Cir. 2006)).  "Laches arises from an extended failure to exercise a right to the detriment of another party," *Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d 634, 639 n.6 (6th Cir. 2009).  A party asserting laches must show[10] (1) lack of diligence by the party against whom the defense is asserted, here the plaintiffs, and (2) prejudice to the party asserting the defense.  *See Bridgeport Music, Inc. v. Justin Combs. Pub.*, 507 F.3d 470, 493 (6th Cir. 2007) (citing *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007) (citation omitted)).

Whether the party confronted with a laches defense has been sufficiently diligent is a fact-dependent inquiry.  In other words, how quickly a party must seek judicial review of a challenged statute or state action depends on all the circumstances.  As Judge Lioi recently stated, "[i]t is well established that in election-related matters, extreme diligence and promptness are required." *McClafferty v. Portage Cty. Bd. of Elections*, 661 F. Supp.2d 826, 839 (N.D. Ohio 2009).  Thus, the

---

[10]

    *But see McClafferty v. Portage Cty. Bd. of Elections*, 661 F. Supp.2d 826, 839 (N.D. Ohio 2009) (Lioi, J.) (rather than the party asserting laches needing to establish its elements, "*The party challenging the election* bears the burden of demonstrating that 'they acted with the requisite diligence.'") (quoting Ohio Supreme Court decisions) (emphasis added).

court must evaluate the plaintiffs' diligence, or lack thereof, in the context of a rapidly approaching election, the party primaries on August 3, 2010. That primary election (1) has been scheduled for many months according to predictable, known law, which apparently has not changed this year, and (2) can be expected to involve hundreds of thousands, if not more than a million voters across an entire, sizeable State. This is even more true of the general election, with its likely greater voter participation compared to the primaries. Even when asserting a colorable constitutional claim, a party reasonably can be expected to act more quickly than the plaintiffs did here. The plaintiffs certainly knew, or should have known, of the logistical difficulty, inefficiency, and confusion that may result if the Secretary's statutory interpretation is struck down or judicially modified close in time to the elections. After filing the complaint, a TRO/PI application, and a reply brief, the plaintiffs have not identified a persuasive reason for waiting until July 12 to file this action.

Accordingly, the court finds that the plaintiffs did not act with reasonable diligence in bringing this action nearly *two full months* after the Secretary issued her declaratory interpretive ruling on May 21, 2010.[11]

---

[11]

Plaintiffs attempt to excuse their waiting nearly two months after the declaratory ruling before filing this action, by pointing out that

[o]n June 25, 2010, counsel for the Plaintiffs met with representatives of the Defendant in order to avoid this litigation. During the meting, the representatives of the Defendant were supplied with the overwhelming authority presented by the Plaintiffs in these proceedings and were advised that in the event that the Defendant maintained her unconstitutional interpretation of Michigan law, litigation would result. Since the Defendant determined to continue her unconstitutional position with respect to the Michigan Campaign Finance Act, the Plaintiffs were required to file this action [and did so] on July 12, 2010 – just 17 days after the representatives of the Defendant advised counsel for the Plaintiffs that the Defendant would not budge from her position. The Plaintiffs respectfully submit that 17 days, particularly over weekends and the 4th of July holiday, does not constitute an unreasonable delay . . . .

21

For these reasons, the court determines that the Secretary has established the first element of laches.  But the Secretary does not come close to establishing the second element of laches:  she fails to show how her office, or the State of Michigan or its voters or citizens or corporations generally, have been meaningfully prejudiced by the plaintiffs' undue delay.  It is true that "[t]he state has a compelling interest in the orderly process of elections.  Court[s] can reasonably endeavor to unnecessarily precipitate changes that would result in immense administrative difficulties for election officials."  *New Democratic Coalition v. Austin*, 41 Mich. App. 343, 356-57, 200 N.W.2d 749 (Mich. 1972) (per curiam) (citing *Reynolds v. Sims*, 377 U.S. 533 (1964)).  In our case, however, the Secretary has not alleged, let alone provided evidence of, some substantial administrative or logistical difficulties, confusion, disorganization, or expense which would be caused if the court allowed the plaintiffs to press these admittedly delayed constitutional claims.  *See Bogaert v. Land*, 572 F. Supp.2d 883, 897 (W.D. Mich. 2008) (Robert Holmes Bell, J.) ("The injunctive relief sought by Plaintiff does not pose the same potential for creating 'immense administrative difficulties for election officials' as the injunctive relief sought by the plaintiffs in *New Democratic Coalition*. Moreover, Wayne County Intervenors have not articulated what change of material condition warrants the application of laches.  Therefore, the doctrine of laches does not bar Plaintiff's lawsuit."), *recon. denied*, 2008 WL 4155338 (W.D. Mich. Aug. 29, 2008), *app. dismissed*, 543 F.3d

This attempt to divide the plaintiffs' nearly two-month post-ruling delay into two shorter artificial periods of time – between the ruling and the meeting, then between the meeting and the filing of this lawsuit – is unavailing.  There was nothing reasonable about further delaying a request for judicial review – either in this court, in state court on appeal from the Secretary's ruling, or both – on the unwarranted assumption that the Secretary would surely change her mind and reverse her own recent ruling.  Notwithstanding the plaintiffs' fruitless meeting with the Secretary's representatives in June, the fact remains that they delayed bringing this lawsuit until about half a year after *Citizens United* and two months after the Secretary's adverse ruling.

862 (6th Cir. 2008) (government's appeal was moot, given that the specific steps ordered by the preliminary injunction it challenged had already been done and could not be un-done).

**Having decided to exercise jurisdiction and rejected the Secretary's laches defense, the court turns now to the propriety of preliminary injunctive relief.** On Tuesday, July 13, 2010, this court denied the Chamber's application for a TRO, but took under advisement its application for a preliminary injunction. *See Michigan Chamber of Commerce et al. v. Michigan Sec'y of State*, 2010 WL 2757975 (W.D. Mich. July 13, 2010) (Maloney, C.J.) ("*Chamber I*"). The court provided the following preliminary analysis:

> The MCFA defines "contribution" broadly to include:
>
>> a payment, gift, subscription, assessment, expenditure, contract, payment for services, dues, advance, forbearance, loan, or donation of money or anything of ascertainable monetary value, or a transfer of anything of ascertainable monetary value to a person, made for the purpose of influencing the nomination or election of a candidate, or for the qualification, passage, or defeat of a ballot question.
>
> M.C.L. § 169.204(1). The MCFA excludes limited volunteer services from the definition of "contribution." M.C.L. § 169.204(3)(a). The MCFA prohibits corporations from making contributions that are "excluded from the definition of a contribution pursuant to section 4(3)(a)." M.C.L. § 169.254(2).
>
> Plaintiffs assert, based on the declaratory ruling issued by Defendant, [that] their ability to exercise their freedom of speech has been unconstitutionally restricted, with the threat of criminal sanctions as enforcement. Specifically, Plaintiffs claim Defendant's interpretation of the statute prevents the political action committee from receiving contributions from corporations for the purpose of making independent expenditures, prevents corporations from contributing to the political action committee, and prevents the corporations from soliciting contributions on behalf of the political action committee.
>
> A. Likelihood of Success on the Merits
> This factor does not weigh in favor of or against the issuance of a temporary restraining order. Plaintiffs base their claim on the holding in *Citizens United.* The holding in *Citizens United* does not clearly resolve the questions raised. *Citizens United* did not directly address the sort of restrictions on corporate contributions at

23

issue here, although the rationale in *Citizens United* may implicate the rationale supporting the restrictions found in the Michigan statute. The other authority cited by Plaintiffs also does not directly address the questions raised here. The court is currently without the benefit of a response to the motion by Defendant.

B.  Irreparable Harm

This factor weighs slightly in Plaintiffs' favor. The United States Supreme Court has held that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Michigan primary election will be held on August 3, 2010. Defendant's interpretation of the MCFA does not ban corporate speech; corporations may use their general revenue funds for their own independent expenditures. Defendant's interpretation of the MCFA restricts corporations from contributing [their] general revenue funds to other third parties for the purpose of independent expenditures. Plaintiffs were aware of Defendant's interpretation of the statute approximately seven weeks before this suit was filed. The court will hold a preliminary injunction hearing nine (9) calendar days from the entry of this order. Given the time parameters, this factor leans somewhat in Plaintiffs' favor.

C.  Balance of Harm to Defendant and Others

This factor does not weigh in favor or against granting the temporary restraining order. In this instance, declining to grant Plaintiffs' request for a temporary restraining order assures a continuation of the status quo, pending a hearing on a preliminary injunction. It is unclear how Defendant or others would be affected, either beneficially or in some negative manner, by a temporary restraining order.

D.  Public's Interest

This favor weighs against issuing a temporary restraining order. The public has an interest in having the laws enacted by its representatives enforced. Courts must begin with the presumption that the challenged statute is constitutional. [footnote: The court, like Defendant, acknowledges that the holdings in *Citizens United* have rendered portions of the MCFA unconstitutional.

Specifically, after *Citizens United*, statutes may not constitutionally prohibit corporations from making independent expenditures to express the corporation's views in support of or in opposition to a political candidate.] *See I.N.S. v. Chada*, 462 U.S. 919, 944 (1983); *Fairbank v. United States*, 181 U.S. 283, 285 (1901); *see also Turner Broadcasting Sys., Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (rejecting a request for an injunction against enforcement of certain sections of a statute and holding that "[t]he 1992 Cable Act, like all Acts of Congress, is presumptively constitutional" and further noting that the applicants were "not merely requesting the stay of a lower court's order, but an injunction against the enforcement of a presumptively valid Act of Congress" which would alter the legal status quo) (Rehnquist, C.J.). As explained by Defendant Land in a statement published in the

Lansing State Journal, she must administer the laws enacted by the Legislature, [and] she cannot make new laws.  (Pl. Ex. B.)

The balance of the four factors weighs against issuing a temporary restraining order. To be clear, the court has not concluded that Defendant's interpretation is correct or that Plaintiffs' correctly claim that the state law is unconstitutional.  The court merely concludes that Plaintiffs have not established that an emergency is occurring which justifies the need for immediate action without affording Defendant an opportunity to be heard.  Two of the factors are neutral.  The irreparable harm factor weighs slightly in Plaintiffs' favor, while the interest of the public weighs more strongly against issuance of the temporary restraining order.  The harm Plaintiffs will suffer between now and the hearing on a preliminary injunction is the same harm they have suffered for the past seven weeks.

*Michigan Chamber 1*, 2010 WL _____ at *____, slip op. at ____ (some paragraph breaks added).

As the Court anticipated, the Secretary has interposed an aggressive defense of Michigan's statutes in light of <u>Citizens United.</u>  However, since the denial of the TRO, the court has had the benefit of full briefing, oral argument, and time for fuller consideration, which leads the court to conclude that preliminary injunctive relief is warranted.

**Test for Preliminary Injunctive Relief.**

"The level of proof required for the Plaintiff to obtain a preliminary injunction or TRO 'is much more stringent than the proof required to survive a summary judgment motion.'" *Luckett v. U.S. Bank Nat'l Ass'n*, 2009 WL 22858, *2 (E.D. Mich. Jan. 5, 2009) (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[W]hat is at issue is not even a defendant's motion for summary judgment, but a plaintiff's motion for preliminary injunctive relief, as to which the requirement for substantial proof is much higher.").

To obtain preliminary injunctive relief, the plaintiff must show that he is being threatened with a legally cognizable irreparable injury for which there is no adequate legal remedy (such as monetary damages). *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (citing *eBay, Inc. v.*

25

*MercExchange, LLC*, 547 U.S. 388, 391 (2006) (Thomas, J.)).  When deciding whether to issue a PI, this court considers (1) whether the plaintiffs have shown a substantial likelihood that they will prevail on the merits, (2) whether there is a threat of irreparable harm to the plaintiffs if the injunction does not issue, (3) whether issuance of the injunction would substantially harm others, and (4) whether issuance of the injunction would serve the public interest.  *Essroc Cement Corp. v. CPRIN, Inc.*, – F. Supp.2d –, –, 2008 WL 5505852, *8 (W.D. Mich. 2008) (Maloney, C.J.) (citing, *inter alia*, *Warshak v. US*, 490 F.3d 455, 465 (6th Cir. 2007))).  The standard is the same whether the applicant seeks an injunction which requires the adversary to do something (a mandatory injunction) or an injunction which forbids the adversary to do something (a prohibitive injunction).  *See PACCAR, Inc. v. Telescan Techs., LLC*, 319 F.3d 243, 249 n.4 (6th Cir. 2003) (citing *United Food & Commercial Workers Union, Local 1099 v. S.W. Ohio Reg. Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998)), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004).

The failure to show any likelihood of success on the merits – let alone a strong or substantial likelihood of success – is enough, by itself,  to warrant denial of preliminary injunctive relief.  *See Abbey v. Amgen, Inc.*, 443 F.3d 540, 547 (6th Cir. 2006) ("a finding of no likelihood of success 'is usually fatal'") (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir 2000)); *see also Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp.2d 962, 967 n.1 (W.D. Mich. 2008) (Maloney, C.J.) ("Our Circuit has not yet expressly called the likelihood of success on the merits [a] *sine qua non* of preliminary injunctive relief.  It has held, however, that it [i]s not error to dispense with analysis of the other three factors where the movants ma[k]e a weak showing on the merits.") (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) and *Jones v. City of Monroe*,

341 F.3d 474, 476 (6ᵗʰ Cir. 2003)).

### DISCUSSION:  FIRST AMENDMENT AND ELECTION LAW

<u>Likelihood of Success on the Merits of the First Amendment Claim.</u>

The first of the four factors strongly favors the issuance of preliminary injunctive relief.

The United States Supreme Court recently reaffirmed that "speech and association for political purposes is the kind of activity to which the First Amendment ordinarily offers its strongest protection . . . ." *Holder v. Humanitarian Law Project*, – U.S. –, – S.Ct. –, 2010 WL 2471055, *27 (U.S. June 21, 2010) (Roberts, C.J., for the majority) (citing, *inter alia*, *NY Times Co. v. Sullivan*, 376 U.S. 254, 259 (1964) (the Founding Fathers fashioned the First Amendment "'to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'") (quoting *Roth v. US*, 354 U.S. 476, 484 (1957))) (emphasis omitted).  The Court has gone so far as to declare that instruments articulating or disseminating ideas and opinions in the political arena are "weapons in the defense of liberty."  *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (rejecting licensing scheme for pamphlets and leaflets).  *See also Siefert v. Alexander*, No. 09-1713, – F.3d –, 2010 WL 2346659, *7 (7ᵗʰ Cir. June 14, 2010) (Tinder, joined by Flaum, with Rovner dissenting in part on other grounds) ("'Speech about the qualifications of candidates for public office' is 'at the core of our First Amendment freedoms.'") (quoting *Republican Party of Minnesota v. White*, 536 U.S. 765, 774 (2002) (Scalia, J., for the majority)).

The court determines that the independent expenditures proposed by the plaintiffs – and the solicitation and pooling of funds they propose in order to make those expenditures both larger and more effective – qualify as core political speech.  That speech must be protected to the fullest extent

possible, because "the First Amendment creates an open marketplace where ideas, *most especially political ideas*, may compete without government interference." *NY State Bd. of Elections v. Lopez-Torres*, 552 U.S. 196, 209 (2008) (J. Scalia, for the Court, joined by all JJ. except Kennedy) (emphasis in original).

Applicable Level of Scrutiny.

If a statute regulates conduct and only incidentally burdens freedom of speech and expression, it is subject only to intermediate scrutiny; under that standard,"a content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Holder v. Humanitarian Law Project*, – U.S. –, – S.Ct. –, 2010 WL 2471055, *18 (U.S. June 21, 2010) (Roberts, C.J., for the majority) (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) (citing *US v. Brien*, 391 U.S. 367 (1968) (rejecting draft-card burner's First Amendment challenge to a conviction under a general prohibition on destroying conscription identification card))). The court determines that the challenged provision – MICH. COMP. LAWS § 169.254(1) as interpreted by the Secretary of State – is not such a provision.

Rather than only "incidentally" burdening the freedoms of speech and association, that section as interpreted by the Secretary directly, substantially, and purposefully burdens those freedoms. As a law that burdens political speech, MICH. COMP. LAWS § 169.254(1) (as interpreted by the Secretary) is "'subject to strict scrutiny', which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United v. Federal Election Commission*, – U.S. –, 130 S.Ct. 876, 898 (2010) (quoting *Federal Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 464, 127 S.Ct. 2652, 2664

28

(2007) (Roberts, C.J., for the Court, joined by JJ. Alito, Scalia, Kennedy and Thomas) (citations omitted)). *See also Green Party of Connecticut v. Garfield*, Nos. 09-0599-cv(L) and 09-0609-cv(Con), – F.3d –, 2010 WL 2737134, *5 (2d Cir. July 13, 2010) (contribution restrictions need only be "closely drawn" to serve a "sufficiently important" government interest, while restrictions on non-contribution campaign expenditures and campaign-related speech are subject to strict scrutiny).

### The Supreme Court's Recent Decision in *Citizens United* (Jan. 2010)

The plaintiffs rely heavily on the Supreme Court's recent decision in *Citizens United v. Federal Election Commission*, – U.S. –, 130 S.Ct. 876 (2010), and rightly so. There, a nonprofit corporation, Citizens United, collected voluntary donations from individuals and for-;profit corporations and used some of the funds to create a highly critical documentary film entitled "Hillary: The Movie", with the apparent purpose of lowering the public's esteem for then-Senator Hillary Rodham Clinton and diminishing her chance of winning her party's presidential nomination. *See Citizens United*, 130 S.Ct. at 886-87. Having released the film in movie theaters and on DVD, Citizens United wanted to increase distribution by making it available to digital-cable-television subscribers through "video on demand" free of charge, and by promoting the video on demand version by running advertisements on broadcast and cable television. *Id.* at 887. Citizens United sued the FEC for declaratory and injunctive relief, stating that it feared being subjected to civil and criminal penalties for violating the Bipartisan Campaign Reform Act of 2002, 2 U.S.C. § 441b ("BCRA"), if it took those actions to express its opposition to the candidacy of Senator Clinton. *Id.* at 887. To understand the particular prohibition of which Citizens United feared running afoul, it is useful to consult the Court's explanation of federal statutory campaign-finance law before and

after the enactment of the BCRA in 2002.

Before the BCRA, federal law prohibited corporations and unions from (1) using general-treasury funds to make direct contributions to candidates[12] or (2) using general-treasury funds to make independent expenditures that expressly advocated the election or defeat of a candidate, through any form of media, in certain specified federal elections. *Citizens United*, 130 S.Ct. at 887. The BCRA continued those prohibitions on corporate/union campaign activity, and added a third: it prohibited corporations and unions from making any "electioneering communication", defined as "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office" made within thirty days of a party primary election or within sixty days of a general election. *Citizens United*, 130 S.Ct. at 887.

While the law post-BCRA prohibited corporations and unions from using general-treasury funds for these three types of payment, it permitted them to establish a "separate segregated fund," i.e., a PAC, for those three purposes. *Id.* PACs, however, were permitted to receive funds only from the PAC's corporation's shareholders and employees (or, in the case of a union, from union members). *Id.* at 888. Citizens United feared that both the documentary film and the ads for the video-on-demand version would violate BCRA's ban on corporate independent expenditures from the corporation's own general-treasury funds. *Citizens United*, 130 S.Ct. at 888.

Speaking through Justice Anthony Kennedy, a majority of five Justices expressly overruled *McConnell v. FEC*, 540 U.S. 93 (2003), which had upheld limits on corporate/union electioneering communications, as well as the decision on which it rested, *Austin v. Michigan Chamber of*

---

[12]

The federal statutory prohibition on corporations/unions using general-treasury funds for direct contributions to candidates was not challenged in *Citizens United*, and both sides agree that such direct contributions to candidates are not at issue in the instant case either.

*Commerce*, 494 U.S. 652 (1990).  *See Citizens United*, 130 S.Ct. at 886.

The Court first noted that a corporation's legal right to create a PAC to "speak" through independent expenditures, was *not* equivalent or tantamount to the *corporation itself* being legally allowed to speak through such independent expenditures.  *Id.* at 897.  For one thing, the Court reasoned, PACS are expensive to administer and subject to burdensome regulations, which may account for the fact that fewer than 2,000 of the nation's millions of corporations have established PACs.  *Id.* at 897-98.  Therefore, as a logical and a practical matter, the fact that a corporation may create a PAC which "speaks" politically through independent expenditures, does not eliminate the burden which BCRA's independent-expenditure prohibition imposed on *corporations/unions'* right to speak through such expenditures, nor does it obviate the need to decide whether such restriction on the corporations/unions' right to make independent expenditures is constitutional.  The Court stated as follows:

> Section 441b's prohibition on corporate independent expenditures is thus a ban on speech.  As a "restriction on the amount of money a person or group can spend on political communication during a campaign," that statute "necessarily reduces the quality of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached."  *Buckley v. Valeo*, 424 U.S. 1, 19 . . . (1976) (per curiam).  Were the Court to uphold these restrictions, the Government could repress speech by silencing certain voices at any of the various points in the speech process.  *See McConnell*, *supra*, at 251, 124 S.Ct. 619 (opinion of Scalia, J.) (Government could repress speech by "attacking all levels of the production and dissemination of ideas", for "effective public communication requires the speaker to make use of the services of others").  If § 441b applied to individuals, no one would believe that it is merely a time, place, or manner restriction on speech.  Its purpose and effect are to silence entities whose voices the Government deems to be suspect.
>
> Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people.  *See Buckley*, *supra*, [424 U.S.] at 14-15, 96 S.Ct. 612 ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential.").  The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a

31

precondition to enlightened self-government and a necessary means to protect it. The First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 . . . (1989) . . . . * * *

For these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence. * * *

Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints.  Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. *See First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 784 . . . (1978).  As instruments to censor, these categories are interrelated:  Speech restrictions based on the identity of the speaker are all too often simply a means to control content.

*Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers.*  By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice.  The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and [which] speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each.

* * * [I]t is inherent in the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes.  At least before *Austin*, the Court had not allowed the exclusion of a class of speakers from the general public dialogue.

We find no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers.  Both history and logic lead us to this conclusion.  * * *

*Citizens United*, 130 S.Ct. at 898-99 (other internal citations omitted).  After reviewing political-speech precedents from the 1930s through the 1960s, *see id.* at 899-901, the majority discussed the purported governmental interests which more recent Supreme Court decisions had found sufficient to justify restrictions on corporate/union political speech and activity.  The *Citizens United* Court reviewed *Buckley v. Valeo*, 424 U.S. 1 (1976) as follows:

32

> In *Buckley* . . . the Court addressed various challenges to the Federal Election Campaign Act of 1971 (FECA) as amended in 1974.  These amendments created 18 U.S.C. § 608(e) . . . , an independent expenditure ban separate from § 610 that applied to individuals as well as corporations and labor unions . . . .
>
> Before addressing the constitutionality of § 608(e)'s independent expenditure ban, *Buckley* first upheld § 608(b), FECA's limits on direct [individual] contributions to candidates.  The *Buckley* Court recognized a "sufficiently important" governmental interest in "the prevention of corruption and the appearance of corruption."  This followed from the Court's concern that large contributions could be given "to secure a political *quid pro quo*."
>
> The *Buckley* Court explained that the potential for *quid pro quo* corruption distinguished direct contributions to candidates from independent expenditures.. The Court emphasized that "the independent expenditure ceiling . . . fails to serve any substantial governmental interest in stemming the reality or appearance of corruption in the electoral process," because "the absence of prearrangement and coordination . . . alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate," . . . .  *Buckley* invalidated § 608(e)'s restriction on independent expenditures . . . .
>
> *Buckley* did not consider § 610's separate ban on corporate and union independent expenditures . . . .  Had § 610 been challenged in the wake of *Buckley*, however, it could not have been squared with the reasoning and analysis of that precedent.  * * * The expenditure ban invalidated in *Buckley*, § 608(e), applied to corporations and unions . . . ; and some of the prevailing plaintiffs in *Buckley* were corporations . . . .  The *Buckley* Court did not invoke the First Amendment's overbreadth doctrine . . . to suggest that § 608(e)'s expenditure ban would have been constitutional if it had applied only to corporations and not to individuals . . . .  [On the contrary,] *Buckley* cited with approval [a previous dissenting opinion], which argued that § 610 [the ban on corporate/union independent expenditures] was unconstitutional.

*Citizens United*, 130 S.Ct. at 901-902 (other internal citations and alterations omitted).  In other words, the *Citizens United* majority considered *Buckley*'s reasoning, its citation of certain authorities, and its choice not to cite certain authorities, as suggesting that the *Buckley* Court would have invalidated the prior statute's ban on corporate/union independent expenditures – and that ban was later recodified at 2 U.S.C. § 441b, the very provision challenged in *Citizens United*.  The Court then noted that two years after *Buckley*, the decision in *First Nat. Bank of Boston v. Bellotti*, 435

U.S. 765 (1978)

reaffirmed the First Amendment principle that the Government cannot restrict political speech based on the speaker's corporate identity. *Bellotti* could not have been clearer when it struck down a state-law prohibition on corporate independent expenditures related to referenda issues:

> "We thus find no support in the First . . . Amendment, or in the decisions of this Court, for the proposition that speech that otherwise would be within the protection of the First Amendment loses that protection simply because its source is a corporation . . . .
>
> * * *
>
> "In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue."

It is important to note that the reasoning and holding of *Bellotti* did not rest on the existence of a viewpoint-discriminatory statute. It rested on the principle that the Government lacks the power to ban corporations from speaking.

*Bellotti* did not address the constitutionality of the State's ban on corporate independent expenditures to support candidates. In our view, however, that restriction would have been unconstitutional under *Bellotti*'s central principle: that the First Amendment does not allow political speech restrictions based on a speaker's corporate identity.

*Citizens United*, 130 S.Ct. at 902-903 (other internal citations and alterations omitted).

Having thus characterized and reaffirmed *Buckley* (1974) and *Bellotti* (1976), the *Citizens United* Court turned a very critical eye to *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990) for "uphold[ing] a direct restriction on the independent expenditure of funds for political speech for the first time in [our country's] history." *Citizens United*, 130 S.Ct. at 903. Specifically, the *Austin* Court upheld a state statute which criminalized corporate independent expenditures supporting or opposing any candidate for state office. *Id.* The rationale for the Court's rejection of *Austin* all but makes the plaintiffs' case.

*Citizens United* examined each of the purported governmental interests which *Austin* used,

34

or which the government in *Citizens United* advanced, and found them all insufficient to justify the restrictions in each case.  "To bypass *Buckley* and *Bellotti*," as *Citizens United* sees it, the *Austin* Court identified the government's supposed compelling "anti-distortion interest", i.e., its "interest in preventing 'the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.'" *Citizens United*, 130 S.Ct. at 903 (quoting *Austin*, 494 U.S. at 660).  The Court emphatically rejected the existence of any such legitimate governmental interest, let alone a compelling interest:

> If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech.  If the antidistortion rationale were to be accepted, however, it would permit Government to ban political speech simply because the speaker is an association that has taken on the corporate form.  * * *

> Political speech is "indispensable to decisonmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual." *Bellotti*, 435 U.S., at 777 . . . .  * * *  This protection for speech is inconsistent with *Austin*'s antidistortion rationale.  *Austin* sought to defend the antidistortion rationale as a means to prevent corporations from obtaining an unfair advantage in the political marketplace by using resources amassed in the economic marketplace.  But *Buckley* rejected the premise that the Government has an interest "in equalizing the relative ability of individuals and groups to influence the outcome of elections."  424 U.S., at 48.  *Buckley* was specific that "the skyrocketing cost of political campaigns" could not sustain the governmental prohibition.  424 U.S., at 26.  The First Amendment's protections do not depend on the speaker's financial ability to engage in public discussion." *Id.*, at 49.

> * * *

> It is irrelevant for purposes of the First Amendment that corporate funds may have little or no correlation to the public's support for the corporation's political ideas.  All speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech.  The First Amendment protects the resulting speech, even if it was enabled by economic transactions with persons or entities who disagree with the speaker's ideas.  * * *

> *Austin*'s antidistortion rationale would produce the dangerous, and unacceptable, consequence that Congress could ban political speech of media corporations.  * * *

*Citizens United*, 130 S.Ct. at 904-905 (other internal citations, alterations & quote marks omitted);

*see, e.g., Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 693 (9th Cir.

2010).[13]

**Having rejected the notion of a governmental interest in countering the allegedly**

**distorting effects of corporate-funded political speech,** *Citizens United* **next considered the**

**governmental interest in preventing corruption or the appearance of corruption connected**

**with elections and campaigns.**  The Court left intact *Buckley*'s holding that the government had

an interest in preventing corruption or the appearance of corruption which was "sufficiently

important" to justify monetary limits on the amount of direct contributions to candidates.  *See*

*Citizens United*, 130 S.Ct. at 908.  It noted, however, that *Buckley* "did not extend this rationale to

independent expenditures, and the Court does not do so here."  *Id.*  On the contrary, the Court held

that "independent expenditures, including those made by corporations, do not give rise to corruption

or the appearance of corruption", *Citizens United*, 130 S.Ct. at 909, and it explained why various

prior Supreme Court decisions did not stand for a contrary view, *id.* at 909-910.  The Court

concluded  its anti-corruption discussion as follows:

> When Congress finds that a problem exists, we must give that finding due deference;
> but Congress may not choose an unconstitutional remedy.  If elected official
> succumb to improper influences from independent expenditures; if they surrender

---

[13]

The Supreme Court also held that the so-called time-protection rationale, "under which the government claims an interest in 'protect[ing] candidates from spending too much time raising money rather than devoting that time to campaigning among ordinary voters,' may not serve as the basis for restricting campaign finance activity."  *McComish v. Bennett*, Nos. 10-15165 & 10-15166, – F.3d –, 2010 WL 2595288, *3 n.3 (9th Cir. June 23, 2010) (quoting *Citizens United*, 558 U.S. at –, 130 S.Ct. at ___)); *see, e.g., Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 693-94 (9th Cir.  2010) ("[T]he City's interest in reducing political fundraising efforts cannot support the LBCRA's application to the Chamber PACs.").  The Secretary does not attempt to invoke any such time-protection interest here.

their best judgment; and if they put expediency before principle, then surely there is cause for concern.  We must give weight to attempts by Congress to seek to dispel either the appearance or the reality of these influences.  The remedies enacted by law, however, must comply with the First Amendment; and, it is our law and our tradition that more speech, not less, is the governing rule.  An outright ban on corporate political speech during the critical preelection period is not a permissible remedy.  Here Congress created categorical bans on speech that are asymmetrical to preventing *quid pro quo* corruption.

*Citizens United*, 130 S.Ct. at 910-11.  After that, the Court rejected the notion that corporate independent expenditures may constitutionally be limited because of the government's supposed interest in protecting dissenting shareholders from being compelled to fund corporate political speech.  *Id.* at 911.

It is very significant for our case that the Court broadly stated, without qualification, that "the Government may not suppress political speech on the basis of the speaker's corporate identity.  *No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations.*"  *Citizens United*, 130 S.Ct. at 913 (emphasis added).

Justice Scalia joined Justice Kennedy's majority opinion, and reinforced its thrust in his separate concurrence,

The Amendment is written in terms of "speech," not speakers.  Its text offers no foothold for excluding any category of speaker, from single individuals to partnerships of individuals, to unincorporated associations of individuals . . . .  We are therefore simply left with the question whether the speech at issue in this case is "speech" covered by the First Amendment.  No one says otherwise.

A documentary film critical of a potential Presidential candidate is core political speech, and its nature as such does not change simply because it was funded by a corporation.  Nor does the character of that funding produce any reduction whatever in the "inherent worth of the speech" and "its capacity for informing the public," *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 777 . . . (1978).  Indeed, to exclude or impede corporate speech is to muzzle the principal agents of the modern free economy.  We should celebrate rather than condemn the addition of this speech to the public debate.

37

*Citizens United*, – U.S. at –, 130 S.Ct. at 929 (Scalia, J., concurring, joined by J. Alito in full and by J. Thomas in pertinent part).  While neither the majority nor Justice Scalia squarely addressed the precise question here, their rationale and language provide direct, strong guidance on our facts.  Just as speech does not become "not speech" or constitutionally less-protected because it is funded by a corporation, it does not become "not speech" or constitutionally less-protected because it is funded by *multiple* corporations, either by donations from each corporation separately to directly defray the speech together or, as the plaintiffs propose, by gathering multiple corporations' funds through the instrument of a political action committee created solely for this purpose.  Applying the majority and Justice Scalia's logic to this closely-related context, the character of the funding – or number of sources of funding – for an independent expenditure cannot eliminate or reduce the peak constitutional protection accorded to the political speech made possible by that expenditure.

**In other words, the fact that the plaintiffs seek to cooperate and act collectively with other corporations to solicit, receive, and direct funds to independent political expenditures in no way undermines the First Amendment's recognition of their right to engage in those activities.**  As the Supreme Court flatly stated just weeks ago, "the simple fact of 'coordination' alone cannot readily remove protection that the First Amendment would otherwise grant.  That Amendment, after all, also protects freedom of association."  *Holder v. Humanitarian Law Project*, – U.S. –, – S.Ct. –, 2010 WL 2471055, *27 (U.S. June 21, 2010) (Roberts, C.J., for the majority) (citing, *inter alia*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911 (1982) (the First Amendment's protections "of speech, assembly, association, and petition, 'though not identical, are inseparable'") (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)) and *DeJonge v. Oregon*, 299 U.S. 353, 364 (1937) (describing the right of peaceable assembly" as "a right cognate to those of

free speech and free presses and . . . equally fundamental").

In short, if the State of Michigan has no constitutional authority to restrict the proposed independent expenditures when done or funded by one entity or person alone, it does not somehow magically acquire authority to restrict those expenditures merely because the spender joins together with other entities which also have the right to make or fund such expenditures – especially after *Citizens United*.

The Michigan Secretary of State concedes that "[b]y overruling *Austin*, the *Citizens United* Court declared that § 54 of the MCFA [MICH. COMP. LAWS § 169.254] is unconstitutional to the extent that it prohibits independent expenditures by corporations."  Gov's Opp at 3.  Thus, the Secretary is left to argue that her interpretation of the challenged provision, MICH. COMP. LAWS § 169.254(1), survives *Citizens United* because it is a prohibition not on independent expenditures, but on "contributions."  *See* Gov's Opp at 4 ("However, because the Court's decision was limited to independent expenditures, it leaves intact § 54's prohibition against corporate contributions.").  The Secretary's attempt to characterize MICH. COMP. LAWS § 169.254(1) as a prohibition on corporate/union contributions (permitted by Citizens United) rather than a prohibition on corporate/union collective action in furtherance of independent expenditures, is accurate as to one type of corporate/union payments to PACs for the purpose of the PAC making an independent expenditure.  The Secretary's argument is wholly untenable, however, as to other such payments from corporations/unions to PACs.

The Secretary argues as follows:

[T]he Michigan Chamber of Commerce established Chamber III PAC for the purpose of receiving contributions from the Chamber and other corporations, like Sterling Corporation, that the PAC would then use to make expenditures on behalf of or against candidates in state elections.

39

The trouble with this proposed action is the when the Chamber and Sterling Corporation donate to Chamber PAC III, these corporations are clearly making a "contribution" as that term is defined in § 4 of the MCFA, and which is prohibited by § 54 of the Act. Accordingly, the Secretary concluded that Plaintiffs could not make or receive such contributions.

\* \* \* Under the MCFA, as interpreted by the Secretary in light of *Citizens United*, Plaintiff corporations are free to make unlimited independent expenditures from their general treasury funds to advocate for or against candidates. What they are not free to do, and which restriction was upheld in *Citizens United*, is make contributions from general treasury funds.

Restrictions on contributions to candidates and committees and subject to "less rigorous scrutiny" and are valid if they are "closely drawn" to meet a "sufficiently important" governmental interest. [n. 11 citing *McConnell*, 540 U.S. at 134-138 and n. 40, and *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. at 259-60, and *Buckley*, 424 U.S. at 25 and 44-45] *Citizens United* and *Republican National Committee v. FEC* [citation at n.12] have not altered this standard for contribution restrictions. As noted in *Citizens United*, the U.S. Supreme Court has consistently recognized that preventing *quid pro quo* corruption or the appearance [thereof] is a sufficiently important interest supporting restrictions on contributions. [*Citizens United*, 130 S.Ct. at 918.]

Gov's Opp at 9-10 (n. 1 omitted).

**The Secretary makes a colorable argument that the MCFA definition of "independent expenditure" is not entirely coterminous with the federal statutory definition of "independent expenditure.** The MCFA defines "independent expenditure" to mean "an expenditure by a person if the expenditure is *not* made at the direction of, or under the control of, another person and if the expenditure is not a contribution to a committee." MICH. COMP. LAWS § 169.209(2) (emphasis added). Federal election law, by contrast, defines "independent expenditure" as an expenditure by a person –

(A)   expressly advocating the election or defeat of a clearly identified candidate; and

(B)   that is not made *in concert or cooperation with or at the request or suggestion* of such candidate, the candidate's authorized political committee,

40

or their agents, or a political party committee or its agents.

2 U.S.C. § 431(17) (emphasis added).

The Secretary accurately notes that the MCFA's definition of independent expenditure does not include the "in concert or cooperation with or at the suggestion of" language of the federal definition. So long the corporation/union's payment to the PAC (and the PAC's subsequent expenditure of those funds) are "not made at the direction of, or under the control of, another person", they will qualify as an independent expenditure under the MCFA. It is unclear whether an expenditure which is "not made at the direction of, or under the control of, another person" (making it an independent expenditure as defined by the MCFA) is also necessarily "not made in concert or cooperation with or at the request or suggestion" of the specified persons/entities. Perhaps some expenditures will meet both the federal and state definitions of independent expenditure; other expenditures will meet one definition but not the other; and other expenditures still will meet neither definition of independent expenditure.

If so, then an expenditure by Chamber PAC III could qualify as independent under the MCFA but not under the federal statute. Certainly neither party has identified any precedent foreclosing this possibility, and the court has not located any. So far, so good, for the Secretary's argument. After this point, however, the Secretary tries to take the argument too far, asserting that *no* corporate/union payments qualify as independent expenditures entitled to *Citizens United* protection unless those payments satisfy the federal statutory definition of independent expenditure. This does not appear logical. While *Citizens United* happened to deal with expenditures which met the federal statutory definition of "independent expenditure", there is no reason to believe that its reasoning does not apply to expenditures which do not meet that definition but nonetheless do not

41

lend the appearance of corruption because the candidate and his agents/party did not have sufficient say over the expenditure to raise the specter of a *quid pro quo*.  So long as a corporation/union payment to a PAC (which then works to support or oppose a candidate's election) does not pose a realistic risk of corruption or the appearance of corruption, the payment will be not a corporate/union "contribution" subject to prohibition, but *conceptually* an independent expenditure entitled to constitutional protection under *Citizens United*.[14]

In the face of the Secretary's novel and partially meritorious argument, the court must strive to maintain fidelity to the First Amendment as interpreted by *Citizens United*.  The Secretary argues as follows:

> It was significant, if not crucial to the holding in *Citizens United*, that the federal independent expenditures in question there were truly independent.  By definition, independent expenditures are "not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents." [i.e., the federal statutory definition of independent expenditure under 2 U.S.C. § 431(17)]

> Indeed, *Citizens United*, quoting from *Buckley*, observed: "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." [n.32 citing 130 S.Ct. at 908 (quoting *Buckley*, 424 U.S. at 47) and, *inter alia*, *FEC v. Nat'l Conservative PAC*, 470 U.S. 480, 497 (1985) ("[There is] no tendency in such expenditures, uncoordinated with the candidate or his campaign, to corrupt or to give the appearance of corruption.")]

> The same cannot be said with respect to independent expenditures in Michigan because corporations or committees have the ability to coordinate expenditures to the advantage of particular candidates.  * * *

---

[14]

Other than preventing *quid pro quo* corruption or the appearance thereof, the government has no legitimate anti-corruption interest in prohibiting corporate political speech. *See Brinkman v. Budish*, 692 F. Supp.2d 855, 863 (S.D. Ohio 2010) (citing *Citizens United*, 550 U.S. at –, 130 S.Ct. at 909).

Here, when Sterling Corporation or the Chamber of Commerce makes a contribution to Chamber PAC III – an arm of the Michigan Chamber of Commerce – Chamber PAC III is not constrained by the MCFA to act truly independently, but rather may coordinate the expenditure of the corporate contributions for the specific advantage of a particular candidate, most likely a candidate endorsed by the Chamber of Commerce. The result is, in effect, a disguised contribution from the corporations to the advantaged candidate. This is not activity entitled to protection under *Citizens United*, particularly in view of the Act's strict prohibition against corporate contributions. The Secretary accordingly determined that corporations cannot make contributions to a committee that makes only independent expenditures as that term is defined in the MCFA.

Gov's Opp at 14-15 (other footnotes omitted, second paragraph break added). This argument is confusing because it conflates a meritorious argument with a meritless one. The proper inquiry is not whether the conduit for the corporate funds (Chamber PAC III) "may" coordinate the expenditure of the corporate funds for the specific advantage of a particular candidate, but whether the PAC *in fact did, in a given case, coordinate with the candidate or his party or committee in such a way as to raise the specter of quid pro quo corruption.*

Under *Citizens United*, the First Amendment does not prevent the State of Michigan from prohibiting corporations/unions from donating to a PAC which then uses the funds in a manner directed or controlled by a candidate (the definition of independent expenditure under MICH. COMP. LAWS § 169.209(2)), *or* in a manner coordinated, -controlled, or in concert or cooperation with or at the request or suggestion of such candidate (the definition of independent expenditure under 2 U.S.C. § 431(17)), *or* in any other manner, regardless of the exact terms used, which raises the appearance, to reasonable people, of *quid pro quo* corruption.

Conversely, if the PAC does not coordinate the expenditure of its funds (which it received, say, from Sterling Corporation or the Chamber itself) with the candidate in a way which raises the risk of actual *quid pro quo* corruption or the appearance of such corruption, *Citizens United* forbids

43

the State from denying the corporations/unions their constitutional right to give those funds to the

PAC.  If a PAC makes *only* these latter expenditures – i.e., expenditures that do not carry a risk of

*quid pro quo* corruption or the appearance thereof – the State constitutionally may not punish or

interfere with these corporations if they choose to donate to the Chamber III PAC for that purpose.

As Chief Judge Sentelle held for the District of Columbia Circuit sitting *en banc*,

> In light of the Court's holding as a matter of law that independent expenditures do
> not corrupt or create the appearance of *quid pro quo* corruption, contributions to
> groups that make only independent expenditures also cannot corrupt or create the
> appearance of corruption.  * * *  No matter which standard of review governs
> [direct-to-candidate] *contribution* limits, the limits on contributions to SpeechNow
> [an unincorporated nonprofit association which was formed solely to make
> independent expenditures, not direct or candidate-coordinated contributions to
> candidates] cannot stand.

*Speechnow.org v. FEC*, 599 F.3d 686, 694-95 and 696 (D.C. Cir. 2010) (C.J. David Sentelle for

unanimous *en banc* Court); *see also Long Beach Area Chamber of Commerce v. City of Long Beach*,

603 F.3d 684, 693 (9th Cir.  2010) ("It is '[t]he absence of prearrangement and coordination of an

expenditure with the candidate or his agent [that] alleviates the danger that expenditures will be

given as a *quid pro quo* for improper commitments from a candidate.'  * * *  It necessarily follows

that the City may not impose financial limits on the Chamber PAC's [non-candidate-coordinated]

independent expenditures.") (quoting *Citizens United*, 130 S.Ct. at 908 (quoting *Buckley*, 424 U.S.

at 37) and citing *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 452 (2001));

*Minnesota Chamber of Commerce*, – F. Supp.2d –, 2010 WL 1838362 (D. Minn. May 7, 2010)

(Minnesota statute prohibiting corporations from making indirect payments for the ultimate benefit

of a political party, committee or individual to promote or defeat a candidacy for nomination,

election or appointment to government office violated the First Amendment as interpreted by

*Citizens United*).

44

**To conclude the analysis of the merits factor,** the court addresses the Secretary's attempt to avoid the clear import of *Citizens United* for this as-applied challenge by emphasizing that *Citizens United* involved the federal definition of independent expenditures, rather than the Michigan statutory definition of independent expenditures which is at issue here. The Secretary believes that the federal definition is materially different from the state definition for our purposes. Primarily, the Secretary noted, particularly at oral argument, that her office has interpreted and applied the state definition of independent expenditures to *include*, i.e., allow, PACs to make such an expenditure with some degree of candidate coordination which falls short of rendering the expenditure at "the direction of, or under the control of, another person" (which MICH. COMP. LAWS § 169.209(2) excludes from the definition of permissible independent expenditures). The Secretary points to a 2003 declaratory interpretive ruling which her office issued at the request of Robert Labrant, who happens to be the current treasurer of plaintiff Chamber III PAC.

Relying on this premise, the Secretary confronts these plaintiffs' written pledge that the Chamber III PAC will not make any independent expenditures which employ *any* degree of candidate/party coordination, even if some such coordination allegedly would be allowed under the Secretary's interpretation of MICH. COMP. LAWS § 169.209(2). Noting that realism demands cynicism in the context of hard-fought political campaigns, the Secretary contends that no matter what these plaintiffs say, the Chamber III PAC may nonetheless go on to coordinate the independent expenditure with a candidate – under what defense counsel called "a wink and a nod" arrangement – in contravention of its pledge. If the PAC does so, the Secretary alleges, it will be difficult and often impossible for the Secretary to discover that fact. Consequently, the Secretary claims that this potential for dishonesty and undiscovered candidate-PAC coordination justifies her prohibition on

45

these corporations donating funds to the Chamber III PAC for the purpose of the PAC making expenditures which otherwise would seem to qualify as permissible independent expenditures under Michigan statute.

At oral argument, the Secretary's counsel conceded, in so many words, that her concern about such PAC and corporate dishonesty was "speculative." This court determines that the First Amendment, as interpreted by *Citizens United*, does not permit the Secretary to abridge the free-speech and free-association rights of these plaintiffs based on such speculation. The powerful deference and broad interpretation which must be accorded to Constitutional rights, counsels in favor of requiring the Secretary to risk the speculative occurrence of such conduct. However undesirable such a state of affairs may seem to some as a matter of public policy, it is far preferable to permitting the Secretary's *certain* and ongoing impairment of these corporations' right to solicit, make, receive, and spend these corporations' general-treasury funds for the purpose of constitutionally protected "true independent expenditures."

Factors 2, 3 and 4 of the Test for Preliminary Injunctive Relief

As for the second factor, the court finds that the plaintiffs, and all other corporations, labor unions, or other voluntary associations restricted by the Secretary's interpretation, are being irreparably harmed every day that they are deterred from exercising their *full* First Amendment rights to political speech and association by fear of prosecution for violating the MCFA as interpreted. As the court previously noted, the loss of First Amendment freedoms, "even for minimal periods of time, unquestionably constitutes irreparable injury." *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (citing, *inter alia*, *G&V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) and *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989)). As

for the third factor, neither the Secretary of State's office nor the State of Michigan will suffer any harm by merely being required to obey the Constitution as interpreted by the Supreme Court. As for the fourth factor, the public interest always strongly favors the vindication of constitutional rights and the invalidation of any state action which infringes on those rights or chills their confident and unfettered exercise. *See Moore v. Brunner*, 2008 WL 2323530, *5 (S.D. Ohio June 2, 2008) ("It ism axiomatic that adherence to constitutional protections is always in the public interest.").

In short, the balance of the four factors solidly favors issuance of a preliminary injunction against the Michigan Secretary of State's enforcement of MICH. COMP. LAWS § 169.254 against any corporations or labor unions pooling their funds (e.g., through a PAC) for the purpose of independent expenditures, i.e., expenditures made by the PAC or other conduit *without coordination, direction, control, or suggestion by or from any candidate*. Indeed, none of the factors counsels against preliminary injunctive relief as to that type of corporate/union payment.[15]

As a final note on the merits, this is an as-applied challenge only, and the plaintiffs aver in writing that the Chamber III PAC will not coordinate any of its independent expenditures with any candidate or candidate-related organization. Accordingly, the court intimates no opinion as to whether *Citizens United* might permit a government to restrict or prohibit corporate/union payments to a PAC for expenditures which *are* coordinated, controlled, directed, or suggested by a candidate or candidate-related organization. Accordingly, preliminary injunctive relief will not issue to prevent the enforcement of MICH. COMP. LAWS § 169.254 against PAC expenditures which are in

---

[15]

Even if the factors presented a close call as to the propriety of preliminary injunctive relief as to such activity, the court would issue such relief because "'First Amendment standards . . . must give the benefit of any doubt to protecting rather than stifling speech.'" *The Independent Institute v. Buescher*, – F. Supp.2d –, 2010 WL 2377072, *18 (D. Colo. June 11, 2010) (quoting *Citizens United*, 558 U.S. at –, 130 S.Ct. at 898).

any way, to any degree, coordinated with a candidate- or candidate-related organized.

**The Court Declines to Issue a Stay Pending Appeal.**

Finally, in light of the urgent nature of these proceedings, judicial efficiency and fairness to these litigants counsels the court to *sua sponte* consider whether to stay today's order pending Secretary's appeal. Federal Rule of Civil Procedure 62(c) provides that "x The standard for a stay pending appeal is akin to the one used in deciding whether to issue a preliminary injunction. *Thalheimer v. City of San Diego*, 2010 WL 1201885, *2 (S.D. Cal. Mar. 23, 2010) (citing *Witner v. Natural Resources Defense Council, Inc.*, – U.S. –, 129 S.Ct. 365, 376 (2008) (C.J. Roberts)), *mot. to vacate stay den.*, 2010 WL 1734952 (S.D. Cal. Apr. 28, 2010). A court may issue a stay pending appeal on consideration of four factors: (1) whether the party which seeks or would benefit from a stay has made a strong showing that he is likely to succeed on the merits; (2) whether the party favoring a stay will be irreparably injured if the stay does not issue; (3) whether issuance of a stay will substantially injure other parties to the proceeding; and (4) where the public interest lies. *Nken v. Holder*, – U.S. –, 129 S.Ct. 1749, 1761 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The first two factors, likelihood of success on the merits of the appeal and irreparable injury to the appealing party, are the most critical. *See Nken*, – U.S. at –, 129 S.Ct. at 1761.

As to the first factor, the constitutionality post-*Citizens United* of restrictions on corporate/union payments to a PAC for the purpose of the Pac making candidate-coordinated expenditures, might present a difficult question. The only matter at issue today, however, is the constitutionality of the Secretary's prohibition on these corporations' payments to a PAC for the purpose of the PAC making "true independent expenditures", i.e., those which involve absolutely no such coordination. On this issue, the court finds that the Secretary is unlikely to succeed on

appeal.

As to the second factor, neither the Secretary's office nor the State of Michigan generally will suffer any irreparable harm from being compelled to allow election payments and activity which are clearly constitutionally protected under *Citizens United*. As to the third factor, staying today's injunction would irreparably harm these plaintiffs by leaving them unable to engage in the proposed First Amendment activity without a very realistic fear of felony prosecution. The irreparable harm to these plaintiffs would be especially egregious given that they wish to exercise their First Amendment rights in this fashion in advance of the party primary elections which take place on August 3, 2010, just eleven days from now. The fourth factor likewise does not favor a stay, because the public interest invariably favors the vindication of constitutional rights and the invalidation of impermissible restrictions on those rights. *See Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) (citing *Connection Distrib.*, 154 F.3d at 288).

Consequently, the court declines to issue a stay pending appeal. *Cf. U.S. Student Ass'n v. Michigan Sec'y of State*, 546 F.3d 373, 377-78 (6th Cir. 2008) (declining to stay order which preliminarily enjoined Secretary from rejecting voter registrations whenever a voter identification card was returned to the Secretary as undeliverable and directed the Secretary to reinstate all voters whose registrations were thus rejected).

## **ORDER**

The court **DECLARES as follows:** as applied by the Michigan Secretary of State to these three plaintiffs, MICH. COMP. LAWS § 169.254 violates these plaintiffs' First and Fourteenth Amendment rights to freedom of speech and freedom of association.

49

The application for preliminary injunction **[#2] is GRANTED in part & DENIED in part.**[16]

The application for a preliminary injunction is granted to the following extent:

The Michigan Secretary of State may <u>not</u> enforce MICH. COMP. LAWS § 169.254 to restrict or prohibit the plaintiff corporations from making payments to the plaintiff political action committee for the purpose of the political action committee making expenditures in connection with a campaign for government office where those expenditures are <u>in no way</u> directly or indirectly coordinated with any candidate or the candidate's campaign committee, political party, or political party committee.

The application for a preliminary injunction is denied to the following extent:

The Michigan Secretary of State may enforce MICH. COMP. LAWS § 169.254 to restrict or prohibit the plaintiff corporations from making payments to the plaintiff political action committee for the purpose of the political action committee making expenditures in connection with a campaign for government office where those expenditures are <u>in any way</u> coordinated with any candidate or the candidate's campaign committee, political party, or political party committee.

For purposes of this order, an expenditure by the plaintiff political action committee will be considered to be "coordinated" if:

    (1)    the expenditure was "made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents" within the meaning of 2 U.S.C.

---

[16]The court's assessment of the likelihood of success on the merits at the preliminary injunction stage does not prevent the court from ultimately ruling differently on the merits for purposes of *permanent* injunctive and declaratory relief.  *See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp. d/b/a Rite Cleaners*, 511 F.3d 535, 542 (6th Cir. 2007) ("A party 'is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits.'") (quoting *Univ. Of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

§ 431(17); or

(2)    the expenditure was "made at the direction of, or under the control of, another person" within the meaning of MICH. COMP. LAWS § 169.209(2); or

(3)    the expenditure does not meet the aforementioned federal and state statutory definitions but otherwise constitutes *quid pro quo* corruption or reasonably fosters the appearance of *quid pro quo* corruption.

Plaintiffs are **NOT REQUIRED** to post bond to secure this preliminary injunction. *See Moore v. Brunner*, 2008 WL 2323530, *5 (S.D. Ohio June 2, 2008).

This is an interlocutory order, but it is immediately appealable. *See Stanton v. Hutchins*, 2010 WL 882822, *12 (W.D. Mich. Mar. 8, 2010) (citing *Overstreet v. Lexington-Fayette Cty. Urban Gov't*, 305 F.3d 566, 572 (6th Cir. 2002)) (citations omitted).[17] The Sixth Circuit reviews *de novo* the question of whether the laches doctrine applies, but applies only abuse-of-discretion review to the resolution of the laches question. *See Cunningham v. Interlake S.S. Co.*, 567 F.3d 758, 763 (6th Cir. 2009) (citing *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007)).

The court **DECLINES** to issue a stay pending appeal.

It is so ordered this 23rd day of July 2010.

                                        /s/ Paul L. Maloney
                                        Honorable Paul L. Maloney

---

[17]

"Generally, a panel entertaining a preliminary injunction appeal decides only whether the district court abused its discretion in ruling on the request for relief and does not go into the merits any further than necessary to determine whether the moving party established a likelihood of success." *Jones v. Caruso*, 569 F.3d 258, 269 (6th Cir. 2009) (citation to out-of-circuit decision and internal quotation marks & alterations omitted).

However, 28 U.S.C. § 1292(a)(1), which governs appeals of interlocutory orders granting or denying injunctions, provides court of appeal with jurisdiction to reach the merits, at least where there are no relevant factual disputes and the matters to be decided are "closely related" to the interlocutory order being appealed. *See Jones*, 569 F.3d at 269 (citing, *inter alia*, *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 757 (1986)).

Chief United States District Judge